250 F.3d 668 (9th Cir. 2001)
 MARY SANDERS LEE, INDIVIDUALLY AND AS THE CONSERVATOR FOR THE ESTATE OF KERRY SANDERS; KERRY SANDERS, PLAINTIFFS-APPELLANTS,
v.
CITY OF LOS ANGELES; A. HADDOCK, OFFICER, #25553; MCCALLESTER, DETECTIVE, #233680; HOLMSTROM, DETECTIVE, #320622; NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES, DEFENDANTS-APPELLEES.
 No. 98-55807
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 13, 2000--Pasadena, California
Filed February 14, 2001
Opinion Withdrawn May 4, 2001
Filed May 4, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Michael D. Seplow and Wilmer J. Harris, Schonbrun & De Simone, Venice, California, for the plaintiffs-appellants.
 Janet Bogigian, Deputy City Attorney, Los Angeles, California, for defendants-appellees, City of Los Angeles, Karl Holmstrom, Julie McCallister, and Art Haddock. Deon J. Nossel, Deputy Attorney General (Argued); Marion R. Buchbinder, Assistant Attorney General (Brief), attorneys for defendants-appellees, Philip Coombe, Jr. and The State of New York Department of Correctional Services.
 Appeal from the United States District Court for the Central District of California; William M. Byrne, District Judge, Presiding. D.C. No. CV-96-07268-WMB.
 Harry Pregerson, William A. Fletcher and Ronald M. Gould, Circuit Judges.
 Pregerson, Circuit Judge.
 
 ORDER
 
 1
 The mandate issued April 5, 2001, is hereby recalled. The Opinion filed February 14, 2001 is withdrawn.
 
 OPINION
 
 2
 This case arises out of the wrongful arrest, extradition, and incarceration of Kerry Sanders, a mentally disabled Los Angeles resident. Employees of the City of Los Angeles ("City") and New York State Department of Correctional Services ("NYSDCS") incorrectly identified Kerry Sanders as the fugitive Robert Sanders, a convicted embezzler who absconded from a New York state-prison work-release program. As a result, Kerry Sanders was extradited from California to New York in October 1993 and incarcerated in a New York state prison until October 1995, when NYSDCS officials learned that the real Robert Sanders had been arrested by federal drug enforcement agents in another jurisdiction. Had defendants at any time compared Kerry Sanders's fingerprints or other identifying characteristics with those of Robert Sanders, or had defendants in any other way verified the identity of the man they had in custody, Kerry Sanders would not have been arrested, extradited, or incarcerated as Robert Sanders.
 
 
 3
 Plaintiff Mary Sanders Lee, individually and as the Conservator for the Person and Estate of her son Kerry Sanders, brought suit claiming violations of constitutional rights under 42 U.S.C. § 1983, violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, 12131-12134, and violations of rights protected by state law.[1] The defendants in this appeal are the City, four individual officers of the Los Angeles Police Department ("LAPD"), Acting Director of NYSDCS Philip Coombe, Jr., and other unnamed employees of the City and NYSDCS (collectively referred to as"defendants"). The district court dismissed all federal claims against defendants with prejudice for failure to state a claim upon which relief can be granted, dismissed all claims against NYSDCS defendants for lack of personal jurisdiction, and dismissed plaintiffs' remaining state claims without prejudice for lack of subject matter jurisdiction. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 I. BACKGROUND
 A. Factual Background
 
 4
 "Because this is an appeal from the dismissal of an action pursuant to [Federal Rule of Civil Procedure] 12(b)(6), we accept as true the facts alleged in the complaint. " Zimmerman v. Oregon Dep't of Justice, 170 F.3d 1169, 1171 (9th Cir. 1999), petition for cert. filed, 121 S.Ct. 1186, 149 L.Ed.2d 103 (2001). Plaintiffs allege the following facts:
 
 
 5
 Kerry Sanders has a long history of mental illness for which he has been institutionalized in the past. He suffers from hallucinations, learning disabilities, and chronic schizophrenia, for which his doctors have prescribed a variety of medications. Kerry Sanders's mental incapacity is"obvious." Because of his mental disability, he was declared mentally incapacitated and his mother, Mary Sanders Lee, was appointed as Conservator for his Person and Estate.
 
 
 6
 In October 1993, the LAPD arrested Kerry Sanders. At some point after his arrest, employees of the LAPD mistakenly identified Sanders as the fugitive named Robert Sanders who had absconded from a Temporary Release Program at Greenhaven Correctional Center in Stormville, New York.[2] Soon thereafter, the LAPD informed officials at NYSDCS that the person the LAPD had in custody was the fugitive Robert Sanders. NYSDCS provided the LAPD with an identification packet on Robert Sanders. The LAPD, however, failed to take proper steps to verify that the individual in their custody was in fact Robert Sanders. Specifically, plaintiffs allege that the LAPD recklessly and with deliberate indifference failed to compare Kerry Sanders's fingerprints and other characteristics with the fingerprints and other characteristics of Robert Sanders, which NYSDCS had provided. Plaintiffs further allege that defendants knew or should have known that Kerry Sanders was not in fact the fugitive Robert Sanders because Kerry Sanders's mental incapacity is "obvious," and because neither his fingerprints nor his physical characteristics match those of Robert Sanders.
 
 
 7
 Acting on the representations of the LAPD, Defendant Philip Coombe, Jr., Acting Director of NYSDCS, and/or other officials of NYSDCS, instructed NYSDCS employees to arrange for Kerry Sanders's extradition. Following an extradition hearing in Los Angeles,[3] these NYSDCS employees traveled to Los Angeles, took custody of Kerry Sanders, and transported him back to New York. But they too failed to verify that the person they transported was in fact the absconded fugitive, Robert Sanders. Instead, they simply had him incarcerated in the Greenhaven Correctional Center without further legal process. The plaintiffs allege that because defendants failed to ensure Kerry Sanders's welfare and safety during his wrongful incarceration in New York, he was allegedly sexually molested by other inmates. He remained in prison until the real Robert Sanders was arrested in another jurisdiction and NYSDCS officials realized that Kerry Sanders was not the fugitive Robert Sanders.
 
 
 8
 Mrs. Lee began searching for her son, Kerry Sanders, shortly after his initial arrest in October 1993. Over the course of the next two years, Mrs. Lee repeatedly contacted the LAPD regarding the whereabouts of Kerry Sanders. Each time she was informed that his whereabouts were unknown.
 
 B. Procedural History
 
 9
 The procedural history of this case is complex and need not be recounted here in full. We note, however, that the complexity of this case is due in part to the fact that some of the defendants filed motions to dismiss the original complaint ("Original Complaint"), while other defendants filed motions to dismiss the First Amended Complaint ("First Amended Complaint").[4] Because this appeal considers motions to dismiss both complaints, we will refer to either the Original Complaint or the First Amended Complaint when necessary.
 
 
 10
 Before proceeding to the merits of the case, it is also useful to set forth the actions of the district court that we must review in this appeal. First, in response to a motion filed by the NYSDCS defendants, and before plaintiffs filed their First Amended Complaint, the district court dismissed the NYSDCS defendants for lack of personal jurisdiction. Second, after plaintiffs filed their First Amended Complaint, the district court also: (1) granted the City's motion to dismiss the § 1983 claims; and (2) denied a motion by plaintiffs for leave to further amend their First Amended Complaint. Finally, the district court dismissed sua sponte plaintiffs' ADA claim against the City, and all claims against the individual LAPD defendants.[5]
 
 
 11
 Plaintiffs timely appeal as to each of these decisions by the district court. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 II. STANDARDS OF REVIEW
 A. Rule 12(b)(6) Standard
 
 12
 When a district court dismisses a claim pursuant to a Rule 12(b)(6) motion, "we evaluate the complaint de novo to decide whether it states a claim upon which relief could be granted." Gonzalez v. Metropolitan Transp. Auth., 174 F.3d 1016, 1018 (9th Cir. 1999). All factual allegations set forth in the complaint "are taken as true and construed in the light most favorable to [p]laintiffs." Epstein v. Washington Energy Co., 83 F.3d 1136, 1140 (9th Cir. 1999). Conclusory allegations of law, however, are insufficient to defeat a motion to dismiss. Id.
 
 B. Notice Pleading Standard
 
 13
 Our review of the district court's orders dismissing plaintiffs' federal claims with prejudice is governed by the federal system of notice pleading under Fed. R. Civ. P. 8(a). Rule 8(a)(2) states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The Supreme Court has stated that"the Rule mean[s] what it sa[ys]." Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993). As the Court explained:
 
 
 14
 [Under] the liberal system of "notice pleading" set up by the Federal Rules[,] Rule 8(a)(2) . . . do[es] not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.
 
 
 15
 Id. (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957); Fed. R. Civ. P. 8(a)(2)). Moreover, the Supreme Court has specifically declared that "a federal court may not apply a heightened pleading standard to a complaint alleging municipal liability under § 1983." Branch v. Tunnell, 14 F.3d 449, 450 (9th Cir. 1994) (citing Leatherman, 507 U.S. at 168).[6] Therefore, the bare requirements of notice pleading under Rule 8(a) govern our review of the legal sufficiency of plaintiffs' claims.
 
 C. Personal Jurisdiction Standard
 
 16
 We review de novo dismissals for lack of personal jurisdiction. Ziegler v. Indian River County, 64 F.3d 470, 473 (9th Cir. 1995).
 
 III. DISCUSSION
 
 17
 Both plaintiffs' Original Complaint and their First Amended Complaint include § 1983 claims alleging violations of: (1) the Due Process Clause of the Fourteenth Amendment; (2) the Fourth Amendment; (3) the right to familial association under the First and Fourteenth Amendments; (4) the Eighth Amendment; (5) the Equal Protection Clause of the Fourteenth Amendment; and (6) the Fifth Amendment. After careful review, we find that the district court erred, in part, in dismissing plaintiffs'§ 1983 claims under Rule 12(b)(6). Specifically, we find that the district court committed two errors, either of which is sufficient to justify reversal. First, the district court erred in finding that plaintiffs failed sufficiently to allege violations of their constitutional rights. Plaintiffs have sufficiently alleged violations of their rights under the First and Fourth Amendments, as well as violations of their rights to both due process and familial association under the Fourteenth Amendment. Second, the district court erred in granting the City's motion to dismiss plaintiffs' § 1983 claims because it relied on extrinsic evidence and took judicial notice of disputed facts.
 
 
 18
 With respect to the ADA claim, we reverse the district court's dismissal of the ADA claim with prejudice and remand this matter to the district court so that plaintiffs may have the opportunity to amend their ADA claim.
 
 
 19
 Finally, we affirm in part and reverse in part the district court's ruling on the NYSDCS defendants' motion to dismiss for lack of personal jurisdiction. Although the district court properly found that it lacked personal jurisdiction over all unnamed NYSDCS defendants who did not significantly participate in the extradition of Kerry Sanders, the district court erred in finding that it lacked personal jurisdiction over the two NYSDCS extradition officers who traveled to California to escort Kerry Sanders back to New York.
 
 A. Section 1983 Claims
 
 20
 As set forth above, the district court erred in dismissing plaintiffs' § 1983 claims for two independent reasons: (1) plaintiffs have pled sufficient facts to state a claim for violations of their rights under the First and Fourth Amendments, as well as violations of their due process rights and familial association rights under the Fourteenth Amendment; (2) the district court relied on extrinsic evidence and took judicial notice of disputed facts. We will address each of these bases for reversal in turn.
 
 1. Dismissal for Failure to State a Claim
 Section 1983 provides:
 
 21
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .
 
 
 22
 42 U.S.C. § 1983. "A local government entity is liable under § 1983 when `action pursuant to official municipal policy of some nature cause[s] a constitutional tort.' " Oviatt v. Pierce, 954 F.2d 1470, 1473-74 (9th Cir. 1992) (quoting Monell v. Dep't of Soc. Serv., 436 U.S. 658, 691 (1978)). In addition, a local governmental entity may be liable if it has a "policy of inaction and such inaction amounts to a failure to protect constitutional rights." Id. at 1474 (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)); see also Monell, 436 U.S. at 690-91. The custom or policy of inaction, however, must be the result of a "conscious," City of Canton, 489 U.S. at 389, or " `deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " Oviatt , 954 F.2d at 1477 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986) (plurality opinion)).
 
 
 23
 A local governmental entity's failure to train its employees can also create § 1983 liability where the failure to train "amounts to deliberate indifference to the rights of persons" with whom those employees are likely to come into contact. City of Canton, 489 U.S. at 388-89. "[F]or liability to attach in this circumstance the identified deficiency in a[local governmental entity's] training program must be closely related to the ultimate injury." Id. at 391 (emphasis added). In other words, a plaintiff must show that his or her constitutional "injury would have been avoided" had the governmental entity properly trained its employees. Oviatt, 954 F.2d at 1474 (citing City of Canton, 489 U.S. at 389-91).
 
 
 24
 Plaintiffs allege that their constitutional rights were violated as the result of at least two distinct incidents involving employees of different governmental entities: (1) in October 1993, the LAPD detained and subsequently arrested Kerry Sanders on a New York State fugitive warrant for a Robert Sanders, and initiated and coordinated Kerry Sanders's extradition with NYSDCS officials; and from October 1993 through October 27, 1995, NYSDCS incarcerated Kerry Sanders as the fugitive Robert Sanders.
 
 
 25
 Accordingly, to prevail on their § 1983 claims, plaintiffs must have sufficiently alleged that: (1) they were deprived of their constitutional rights by defendants and their employees acting under color of state law; (2) that the defendants have customs or policies which " `amount[ ] to deliberate indifference' " to their constitutional rights; and (3) that these policies are the " `moving force behind the constitutional violation[s].' " Oviatt, 954 F.2d at 1473, 1477 (quoting City of Canton, 489 U.S. at 389-91). As we explained in Oviatt, deliberate indifference to a person's constitutional rights occurs when the need for more or different action,
 
 
 26
 "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury.
 
 
 27
 Id. at 1477-78 (quoting City of Canton , 489 U.S. at 390, and citing Davis v. Mason County, 927 F.2d 1473, 1482 (9th Cir. 1991)) (emphasis added).
 
 
 28
 Here, plaintiffs' § 1983 claims meet the requirements of notice pleading. Indeed, defendants' papers filed in support of their motions to dismiss and on appeal demonstrate that they had fair notice of what the plaintiffs' claims are and the grounds upon which they rest. See Leatherman, 507 U.S. at 168. For example, plaintiffs allege the following against the City:
 
 
 29
 [Despite the City's] aware[ness] that persons taken into custody by the LAPD -- in particular persons with mental disabilities -- were often misidentified . . . the City of Los Angeles deliberately failed [to properly train and supervise their employees (including the police) and] to implement and maintain proper procedures which would have required that prior to the processing for extradition of any person to a foreign jurisdiction, some efforts -- such as the verification of fingerprints -- are made to match the identity of the person in custody with that of the person wanted. Indeed . . . the City of Los Angeles maintained an official policy, custom or practice of rounding up people for arrest and/or extradition without taking proper efforts to ensure that the particular person in custody was actually the person being sought . . . . [A]s a result of the aforementioned policy, practice or custom, no one bothered to check the identity of Mr. Sanders, thereby causing him to be extradited to New York where he remained imprisoned for two years.
 
 
 30
 Because of the risk that persons -- especially mentally incapacitated persons who are incapable of taking care of themselves -- will be mistakenly extradited to a foreign jurisdiction when no steps are taken to confirm their identities is a grave one, the need for training and procedures to guard against such risks is obvious. However, despite this obvious risk, [the] City of Los Angeles [ ] chose to ignore the problem, thereby displaying an official custom, policy or practice which was deliberately indifferent to the rights of persons who were likely to come into contact with the criminal justice system.
 
 
 31
 Moreover, both plaintiffs' Original Complaint and their First Amended Complaint are replete with allegations that the defendants acted "deliberately," "recklessly," "intentionally," "maliciously," or with "deliberate indifference" and "conscious disregard of [their] rights." Both complaints allege "that all acts or omissions alleged to have been engaged in by any defendant are alleged to have been engaged in with evil motive and intent, and in callous, reckless, and wanton disregard to the rights of any plaintiff."
 
 
 32
 "In this circuit, a claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss`even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice.' " Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 624 (9th Cir. 1988). Here, plaintiffs allege more than "bare allegations" that the individual defendants' conduct "conformed to an official policy, custom, or practice." Id. Plaintiffs sufficiently allege that the City maintained policies that "amount[ed] to deliberate indifference" to their constitutional rights and that the policies were "the moving force behind the constitutional violation." Oviatt, 954 F.2d at 1474. The district court erred in concluding otherwise.[7]
 
 
 33
 Thus, the only question that remains is whether plaintiffs sufficiently allege that defendants' conduct deprived Kerry Sanders and his mother of their constitutional rights. Plaintiffs allege violations of their rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. We address each of plaintiffs' constitutional claims in turn.
 
 
 34
 a. Fourteenth Amendment -- Due Process
 
 
 35
 "Liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment." Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc). Moreover, "[t]he Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction." Oviatt, 954 F.2d at 1474 (citing Baker v. McCollan, 443 U.S. 137, 144 (1979)). As the Court explained:
 
 
 36
 [D]epending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law."
 
 
 37
 Baker, 443 U.S. at 145. Thus, the loss of liberty caused by an individual's mistaken incarceration "after the lapse of a certain amount of time" gives rise to a claim under the Due Process Clause of the Fourteenth Amendment. Id. As one court explained, a detainee has "a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release. " Cannon v. Macon County, 1 F.3d 1558, 1563 (11th Cir. 1993) (citing Sivard v. Pulaski County, 959 F.2d 662, 688 (7th Cir. 1992) (holding that the continued detention of the plaintiff where the sheriff knew it was wrongful states a claim under§ 1983 for a due process violation)); Sanders v. English , 950 F.2d 1152, 1162 (5th Cir. 1992) (holding that the failure to release a pre-trial detainee after police officer knew or should have known that plaintiff had been misidentified gives rise to cause of action under § 1983).
 
 
 38
 Here, plaintiffs allege that defendants recklessly and with deliberate indifference to Kerry Sanders's right to due process ignored his "obvious" mental incapacity and failed to take any steps to identify him before arresting him as Robert Sanders pursuant to a fugitive warrant, extraditing him to New York, and causing his incarceration for two years. According to plaintiffs' allegations, had defendants simply compared Kerry Sanders's fingerprints or physical characteristics with those of the fugitive Robert Sanders, or otherwise attempted to verify Kerry Sanders's identity, they would have discovered that he was not Robert Sanders. Assuming these allegations are true, they are clearly sufficient to establish that defendants violated Kerry Sanders's "liberty interest in being free from incarceration" absent probable cause for his arrest. Oviatt, 954 F.2d at 1474.
 
 
 39
 Moreover, plaintiffs' Original Complaint more than adequately alleges defendants' failure to accord Kerry Sanders "minimum due process appropriate to the circumstances to ensure that [his] liberty [was] not arbitrarily abrogated." Id. at 1475 (quoting Haygood, 769 F.2d at 1355); see also Cannon, 1 F.3d at 1564 (finding that defendants acted with deliberate indifference to plaintiff's due process rights when they arrested, extradited on a fugitive warrant, and detained her for seven days without taking steps to verify her identity when a comparison of her physical characteristics and official records would have revealed that she was not the fugitive); Oviatt, 954 F.2d at 1477 (holding that due process violation occurred when schizophrenic arrestee was incarcerated for 114 days before arraignment due to lack of internal tracking procedure at jail for court appearances).[8]
 
 
 40
 The argument that Kerry Sanders's due process claim must fail at the pleading stage because he was incarcerated for only one day before his extradition hearing is also unavailing. Although the Supreme Court held in Baker that the arrestee's mistaken incarceration on a facially valid warrant for three days in that case did not amount to a deprivation of due process, the Court stated that the mistaken incarceration of an individual in other circumstances may violate his or her right to due process "after the lapse of a certain amount of time," "depending on what procedures the State affords defendant[ ] following arrest and prior to trial." Baker , 443 U.S. at 144-45. Here, plaintiffs allege that defendants arrested Kerry Sanders as the fugitive Robert Sanders without probable cause in violation of the Fourth Amendment. Plaintiffs further allege that the lack of probable cause arose from defendants' deliberate indifference to Kerry Sanders's rights and/or from defendants' conscious failure to train their employees in the procedures necessary to avoid the mistaken extradition and incarceration of mentally incapacitated persons like Kerry Sanders. In such circumstances, a due process violation may have occurred. See Erdman v. Cochise County, Arizona, 926 F.2d 877, 882 (9th Cir. 1991); see also Baker , 443 U.S. at 145-46. Certainly at the pleading stage we cannot conclude otherwise.
 
 
 41
 In addition, defendants' argument that the extradition proceedings broke the causal connection between the defendants' conduct and Kerry Sanders's two-year incarceration cannot defeat plaintiffs' claim at the pleading stage. Plaintiffs repeatedly allege in their First Amended Complaint that all defendants acted with reckless disregard for Kerry Sanders's rights. This is sufficient to survive a motion to dismiss.
 
 
 42
 Accordingly, we hold that plaintiffs have sufficiently alleged a violation of Kerry Sanders's due process rights under the Fourteenth Amendment.
 
 
 43
 b. Fourth Amendment
 
 
 44
 "[A]n arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983." Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1988). Here, plaintiffs allege that the City and the individual LAPD defendants arrested Kerry Sanders as the fugitive Robert Sanders without probable cause because no reasonable police officer could have believed that Kerry Sanders was the same person as Robert Sanders given Kerry Sanders's"obvious mental incapacity" and the fact that Kerry Sanders's fingerprints and other identifying characteristics did not match those of Robert Sanders. Plaintiffs further allege that "the LAPD defendants recklessly and with deliberate indifference [to Kerry Sanders's constitutional rights] failed to check the fingerprints and other characteristics of Kerry Sanders and compare those with the fingerprints and other characteristics of Robert Sanders, which had been provided to the LAPD defendants by NYSDCS." Assuming the truth of these allegations as we must under Rule 12(b)(6), we hold that plaintiffs have adequately alleged a violation of Kerry Sanders's rights under the Fourth Amendment.
 
 
 45
 c. First and Fourteenth Amendments -- Right to Familial Association
 
 
 46
 It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and that "[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. §] 1983." Kelson v. City of Springfield, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing Santosky v. Kramer, 455 U.S. 745, 753 (1982)). "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987) overruled on other grounds by Hodges v. De La Vina, 199 F.3d 1037 (9th Cir. 1999). Moreover, "the First Amendment protects those relationships, including family relationships, that presuppose`deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " Board of Dir. v. Rotary Club, 481 U.S. 537, 545 (1987) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 619-20 (1984)); see also Conti v. City of Fremont, 919 F.2d 1385, 1388-89 (9th Cir. 1990).
 
 Here, plaintiffs allege that:
 
 47
 Mary Sanders Lee began searching for her son after his arrest. She contacted the Los Angeles Police Department, unknown employees of which told her that they had no record of, or information concerning, her son, when in fact, they knew or should have known that they had falsely arrested him and caused him to be extradited to New York. From 1993 to 1995, Mrs. Lee repeatedly contacted the Los Angeles Police Department regarding the whereabouts of Kerry Sanders. However, each time she was informed that his whereabouts were unknown . . . . [T]he reckless, intentional and deliberate acts and omissions of defendants . . . were a direct and legal cause of the deprivation of [Plaintiffs'] constitutionally protected right under the First and Fourteenth Amendments to the association, companionship and society of one and other as mother and son.
 
 
 48
 Assuming the truth of these allegations, plaintiffs have adequately alleged that defendants' actions and policies constituted an "unwarranted interference" with Kerry Sanders's and his mother's right to familial association under both the First and Fourteenth Amendments. Accordingly, we hold that plaintiffs have sufficiently alleged violations of the First and Fourteenth Amendments.
 
 
 49
 d. Eighth Amendment -- Failure to Protect from Harm
 
 
 50
 The Eighth Amendment's prohibition of "cruel and unusual punishments" applies only "after conviction and sentence." Graham v. Connor, 490 U.S. 386, 393 & n.6 (1989) (citing Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977)). Pretrial detainees "are not convicted prisoners. " Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996). Therefore, pretrial detainees are accorded no rights under the Eighth Amendment. See id. Instead, their rights arise under the Due Process Clause of the Fourteenth Amendment. See id. (citing Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)).
 
 
 51
 Here, plaintiffs allege that Kerry Sanders was incarcerated "for a crime . . . for which he had not been tried or convicted." Thus, for purposes of the Eighth Amendment, Kerry Sanders is a detainee, not a convicted prisoner. Accordingly, we find that plaintiffs have failed to state a claim that Kerry Sanders's Eighth Amendment rights were violated.
 
 
 52
 e. Fourteenth Amendment -- Equal Protection
 
 
 53
 "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall `deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998), cert. denied, 525 U.S. 1154 (1999). Where the challenged governmental policy is "facially neutral," proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy. Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-66 (1977) (citing Washington v. Davis, 426 U.S. 229, 242 (1976)) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination."). Because "the disabled do not constitute a suspect class" for equal protection purposes, a governmental policy that purposefully treats the disabled differently from the nondisabled need only be "rationally related to legitimate legislative goals" to pass constitutional muster. Does 1-5 v. Chandler, 83 F.3d 1150, 1155 (9th Cir. 1996) (citing City of Cleburne, 473 U.S. at 440).
 
 
 54
 The allegation most pertinent to plaintiffs' equal protection claim reads as follows:
 
 
 55
 Given the fact that there are thousands of mentally incapacitated persons who come into contact with the criminal justice system each year, the defendants' failure to provide for sufficient training regarding mentally disabled persons or to implement other procedures to safeguard the rights of mentally disabled persons amounts to deliberate indifference to these persons' rights [and] denies such persons equal protection of the laws . . . .
 
 
 56
 Reading plaintiffs' claim in the most favorable light, we conclude that plaintiffs do not allege that defendants treat disabled persons as a protected class differently from other similarly situated individuals "who come into contact with the criminal justice system." Indeed, the gravamen of plaintiffs' complaint is that defendants failed to treat disabled persons differently from others similarly situated.
 
 
 57
 With respect to the discriminatory purpose element of their equal protection claim, plaintiffs plead only that defendants knowingly or with deliberate indifference to the rights of the mentally disabled adopted facially neutral policies of inaction that have had a discriminatory impact on disabled persons. Plaintiffs failed to allege that defendants' acts or omissions were motivated by discriminatory animus toward the mentally disabled as a protected class. The mere fact that defendants' facially neutral policies had a foreseeably disproportionate impact on an identifiable group does not mean that they violated the Equal Protection Clause. See Navarro v. Block, 72 F.3d 712, 716 n.5 (9th Cir. 1996)." `Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part `because of,' not merely `in spite of,' its adverse effects upon an identifiable group." Id. (quoting Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979) (alteration in original)).
 
 
 58
 For these reasons, we find that plaintiffs have failed to state a claim for violation of the Equal Protection Clause of the Fourteenth Amendment.
 
 
 59
 f. Fifth Amendment
 
 
 60
 Plaintiffs also allege a violation of Kerry Sanders's rights under the Fifth Amendment. The Due Process Clause of the Fifth Amendment and the equal protection component thereof apply only to actions of the federal government -- not to those of state or local governments. Schweiker v. Wilson, 450 U.S. 221, 227 (1981). The plaintiffs do not allege that any of the defendants are federal actors. Accordingly, we hold that plaintiffs have failed to state a claim alleging a violation of the Fifth Amendment.
 
 
 61
 g. Conclusion
 
 
 62
 In sum, after reviewing plaintiffs' pleadings with respect to each alleged constitutional violation, we find that plaintiffs have pled sufficient facts to state a claim for violations of their rights under the First and Fourth Amendments, as well as violations of their rights to due process and familial association under the Fourteenth Amendment. We therefore reverse the district court's dismissal of plaintiffs' § 1983 claims to the extent that plaintiffs successfully allege the above-mentioned constitutional violations.
 
 
 63
 We also find that the district court did not err in dismissing plaintiffs' claims for violations of their rights under the Fifth and Eighth Amendments, as well as their claim for violation of their rights under the Equal Protection Clause of the Fourteenth Amendment. Because it appears that plaintiffs' claims under the Fifth and Eighth Amendments cannot be cured by amendment, see Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996), we affirm the district court's dismissal of those claims with prejudice. It is not clear, however, that plaintiffs' Equal Protection claim cannot be saved by amendment, so we remand this matter to the district court so that plaintiffs may have the opportunity to amend their Fourteenth Amendment claim.
 
 
 64
 2. Judicial Notice and Consideration of Extrinsic Evidence
 
 
 65
 As discussed supra, when the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), "[r]review is limited to the complaint." Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993). All factual allegations set forth in the complaint "are taken as true and construed in the light most favorable to [p]laintiffs." Epstein, 83 F.3d at 1140. Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6). Yet, in this case, defendants' arguments in favor of affirming the dismissal of plaintiffs' federal claims rest almost entirely on factual challenges. More importantly, the district court's decision to dismiss plaintiffs' federal claims was rooted in defendants' factual assertions. In granting defendants' motions, the court assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, took judicial notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in the light most favorable to plaintiffs. We therefore also reverse the district court's dismissal of plaintiffs' § 1983 claims alleging violations of the First, Fourth, and Fourteenth Amendments on these independent grounds.
 
 
 66
 As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." Branch, 14 F.3d at 453 (citation omitted). Rule 12(b)(6) expressly provides that when:
 
 
 67
 matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
 
 
 68
 Fed. R. Civ. P. 12(b)(6) (emphasis added). There are, however, two exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion. First, a court may consider "material which is properly submitted as part of the complaint" on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. Branch, 14 F.3d at 453 (citation omitted). If the documents are not physically attached to the complaint, they may be considered if the documents' "authenticity . . . is not contested" and "the plaintiff's complaint necessarily relies" on them. Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (9th Cir. 1998). Second, under Fed. R. Evid. 201, a court may take judicial notice of "matters of public record." Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir. 1986). We review a district court's decision to take judicial notice for abuse of discretion. Ritter v. Hughes Aircraft Co., 58 F.3d 454, 458 (9th Cir. 1995).
 
 
 69
 Here, defendant NYSDCS attached several exhibits to its motion to dismiss, including declarations from three NYSDCS employees. The declarations recounted various statements that Kerry Sanders allegedly made -- one to defendant LAPD officers upon his original arrest, another to one of the NYSDCS extradition officers who brought Kerry Sanders to New York, and a third to the NYSDCS official who interviewed Kerry Sanders after his true identity was discovered in 1995. According to the declarants, Kerry Sanders allegedly told the LAPD officers and the NYSDCS extradition officer that he was Robert Sanders. Kerry Sanders also purportedly told another NYSDCS official that he told the LAPD he was Robert Sanders because he thought they were arresting him for shooting a hole through his cousin's house in Arizona and he was trying "to avoid getting in trouble for the shooting incident."
 
 
 70
 In their opposition to defendants' motions, plaintiffs vigorously denied that Kerry Sanders ever made these statements or even had the mental capacity to have made these statements. Plaintiffs also objected to the district court's consideration of defendants' declarations as inadmissible hearsay, and submitted an affidavit from Kerry Sanders's mother stating that her son had never been in Arizona.
 
 
 71
 In granting defendants' motions to dismiss, the district court declined to rule on plaintiffs' hearsay objections given "the court's disposition of the case." Nevertheless, it appears that the court considered this extrinsic evidence in granting the defendants' motions to dismiss. Specifically, the court stated "this case apparently presents the relatively unique situation of an innocent person who attempted to pass himself off as an escaped prisoner." Neither the Original Complaint nor the First Amended Complaint contain any allegation that Kerry Sanders ever told anyone that he was Robert Sanders, let alone that he wanted to pass himself off as Robert Sanders. Thus, for purposes of the Rule 12(b)(6) motions to dismiss, there was no basis for the district court to make the factual finding that Kerry Sanders "attempted to pass himself off as [the] escaped prisoner" Robert Sanders.
 
 
 72
 In reaching this conclusion, the district court also erred by taking judicial notice of disputed matters. The court took judicial notice of two documents: (1) the Waiver of Extradition form, according to which Kerry Sanders purportedly "intelligently, knowingly, and voluntarily" waived his right to challenge his extradition and admitted being Robert Sanders; and (2) the transcript of the extradition hearing at which Kerry Sanders stated that he purportedly understood the rights he was giving up by signing the waiver. Both documents were attached as exhibits to defendants' motions to dismiss.
 
 
 73
 A court may take judicial notice of"matters of public record" without converting a motion to dismiss into a motion for summary judgment. MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986). But a court may not take judicial notice of a fact that is "subject to reasonable dispute." Fed. R. Evid. 201(b). Thus, the district court had authority under Rule 201 to take judicial notice of the fact of the extradition hearing, the fact that a Waiver of Extradition was signed by Kerry Sanders,[9] and the fact that Kerry Sanders purportedly waived his right to challenge his extradition to New York as "Robert Sanders." The court may also have had the authority to do so because plaintiffs' First Amended Complaint repeatedly refers to the extradition process that Kerry Sanders underwent, and arguably incorporates the fact of the extradition hearing and the waiver by reference. See Parrino, 146 F.3d at 705-06.
 
 
 74
 But the court did more than take judicial notice of undisputed matters of public record. The court took judicial notice of disputed facts stated in public records. Indeed, the court relied on the validity of Kerry Sanders's Waiver of Extradition in dismissing plaintiffs' § 1983 claims at the pleading stage. As the district court stated: "Sanders personally waived his right to contest extradition and informed the court and counsel that he was, in fact, the Robert Sanders sought in New York." On this basis, the court concluded that "the `moving force' behind the misidentification of [Kerry Sanders] was his waiver of extradition and his right to raise the issue of identity at his extradition hearing."
 
 
 75
 On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 426-27 (3rd Cir. 1999). Here, the district court incorrectly took judicial notice of the validity of Kerry Sanders's waiver, which was as yet unproved.
 
 
 76
 Moreover, in concluding that Kerry Sanders's waiver of extradition was valid and constituted the "moving force" behind his injury, the district court failed to draw all reasonable inferences from plaintiffs' allegations that Kerry Sanders is "mentally incapacitated and mentally disabled, " "has been diagnosed as suffering from chronic schizophrenia for which he has been prescribed a variety of medications, " and "suffers from hallucinations and learning disabilities."[10] Had the district court accepted these allegations as true and drawn all reasonable inferences in plaintiffs' favor, see Epstein, 83 F.3d at 1140, the district court could not have presumed the validity of Kerry Sanders's waiver of extradition.
 
 
 77
 Accordingly, we hold that the district court erred in granting the City's motion to dismiss plaintiffs'§ 1983 claims under the First, Fourth, and Fourteenth Amendments by relying on extrinsic evidence and by taking judicial notice of disputed matters of fact to support its ruling.
 
 
 78
 B. Plaintiffs' Americans with Disabilities Act Claim
 
 
 79
 As set forth above, plaintiffs' First Amended Complaint also includes a claim for violation of the Americans with Disabilities Act ("ADA"). Title II of the ADA provides that: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA thus not only prohibits public entities from discriminating against the disabled, it also prohibits public entities from excluding the disabled from participating in or benefitting from a public program, activity, or service "solely by reason of disability." Weinreich v. Los Angeles County Metro. Transp. Auth., 114 F.3d 976, 978-79 (9th Cir. 1997) (quoting Does 1-5, 83 F.3d at 1155) (emphasis in original). If a public entity denies an otherwise"qualified individual"[11] "meaningful access" to its "services, programs, or activities" "solely by reason of" his or her disability, that individual may have an ADA claim against the public entity. Id. (citing Alexander v. Choate, 469 U.S. 287, 301-02 (1985) (internal citation omitted)).
 
 
 80
 The ADA broadly "defines `public entity' as`any State or local government [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government.' " Armstrong v. Wilson , 124 F.3d 1019, 1023 (9th Cir. 1997) (quoting 42 U.S.C. § 12131(1)). This "include[s] every possible agency of state or local government." Id. (quoting Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 485 (7th Cir. 1997)). Hence, the ADA applies to state prisons, see Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 209 (1998); Bogovich v. Sandoval , 189 F.3d 999, 1002 (9th Cir. 1999), and local law enforcement agencies, see Gorman v. Bartch, 152 F.3d 907, 912-13 (8th Cir. 1998).
 
 
 81
 Quite simply, the ADA's broad language brings within its scope " `anything a public entity does.' " Pennsylvania Dep't of Corr. v. Yeskey, 118 F.3d 168, 171 & n.5 (3d Cir. 1997), aff'd 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA regulations). This includes programs or services provided at jails, prisons, and any other " `custodial or correctional institution.' " Id. "[A]lthough `[i]ncarceration itself is hardly a "program" or "activity" to which a disabled person might wish access,' " mental health services and other activities or services undertaken by law enforcement and provided by correctional facilities to those incarcerated are "services, programs, or activities of a public entity" within the meaning of the ADA. Armstrong, 124 F.3d at 1023-24 (quoting Crawford, 115 F.3d at 483 (internal citation omitted) (alteration in original)); see also Yeskey, 524 U.S. at 209. Certainly, if " `prisoners do not park [their rights against discrimination] at the prison gates,' " Armstrong, 124 F.3d at 1025 (quoting Crawford, 115 F.3d at 486), pretrial detainees do not do so either, see Gorman, 152 F.3d at 913 (holding that wheelchair-bound arrestee has valid claim under ADA where local police "denied him the benefit of post-arrest transportation appropriate in light of his disability").
 
 
 82
 In the instant action, the district court did not err in dismissing plaintiffs' ADA claim for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The district court erred, however, when it dismissed the plaintiffs' ADA claim under Rule 12(b)(6) without leave to amend.[12] Under our case law, "dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." Chang, 80 F.3d at 1296; see also Schneider v. California Dep't of Corr., 151 F.3d 1194, 1196 (9th Cir. 1998). Because it is not clear that plaintiffs' ADA claim cannot be saved by amendment, we remand this matter to the district court so that plaintiffs may have the opportunity to amend their ADA claim.
 
 
 83
 C. Personal Jurisdiction -- The NYSDCS Defendants
 
 
 84
 Finally, we review the district court's decision to grant the NYSDCS defendants' motion to dismiss for lack of personal jurisdiction. On a motion to dismiss for lack of personal jurisdiction, the plaintiff has the "burden to establish jurisdiction." Ziegler, 64 F.3d at 473. "[T]he plaintiff [,however,] need only make a prima facie showing of jurisdiction." Id. Our de novo review of the district court's decision dismissing the claims against all NYSDCS defendants for lack of personal jurisdiction leads us to affirm the court's decision with respect to all unnamed NYSDCS defendants who did not significantly participate in the extradition of Kerry Sanders and whose interaction with Kerry Sanders took place solely in New York State. We reverse, however, the district court's decision to dismiss the claims against the two NYSDCS extradition officers who were directly involved in the extradition of Kerry Sanders and in fact traveled to California to pick him up and take him to New York. We leave to the district court to determine on remand whether, consistent with our opinion, there are additional NYSDCS officials whose involvement in Kerry Sanders's extradition was sufficient to establish the court's in personam jurisdiction over them.
 
 
 85
 A federal court may exercise personal jurisdiction that "comport[s] with the state long-arm statute, and with the constitutional requirement of due process." Omeluk v. Langston Slip & Batbyggeri A/S, 52 F.3d 267, 269 (9th Cir. 1995). California's long-arm statute permits its courts to exercise jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." Cal. Code Civ. Proc. § 410.10. To establish the district court's personal jurisdiction over NYSDCS defendants, plaintiffs must show that:"(1) defendants purposefully availed themselves of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws; (2) [their] claims arise out of defendants' California-related activities; and (3) the exercise of jurisdiction would be reasonable." Ziegler , 64 F.3d at 473 (citation omitted).
 
 1. Purposeful Availment
 
 86
 In a § 1983 claim, a defendant purposely avails himself of the privilege of conducting activities in California if he "engages in conduct aimed at, and having effect in, the . . . state." Id. The district court here concluded that NYSDCS as an entity did not "direct its actions toward California in order to have Kerry Sanders arrested." According to the district court, NYSDCS simply used the NCIC to put out a fugitive warrant on Robert Sanders, upon which California authorities acted. Following this reasoning, the court ruled that NYSDCS's actions did not constitute purposeful availment. In so ruling, the district court erred.
 
 
 87
 First, plaintiffs did not sue NYSDCS as an entity. Plaintiffs sued Philip Coombe, Jr., Acting Director of NYSDCS, and "50 unknown named employees of [NYSDCS] . . . in their individual capacities. " The question for the district court, therefore, was whether any of these individual defendants "engage[d] in conduct aimed at, and having effect in" California. The question was not whether NYSDCS as an entity or the individual NYSDCS defendants collectively purposefully availed themselves of the privilege of conducting activities in California. NYSDCS as an entity may not have directed its efforts to arrest Robert Sanders toward California by simply registering Robert Sanders's fugitive warrant with the NCIC. But individual employees of NYSDCS did direct their efforts toward California to arrest, extradite, and transport Kerry Sanders after he was misidentified as the fugitive Robert Sanders.
 
 
 88
 Second, in making its ruling, the district court relied on two out-of-circuit cases for the proposition that "simply accessing the information available through the NCIC system is insufficient to constitute `purposeful availment.' " Cook v. Holzberger, 788 F. Supp. 347, 351 (S.D. Ohio 1992); McLeod v. Harmon, 500 N.E.2d 724, 726 (Ill. App. Ct. 1986). That proposition would be correct if the defendants' only contact with the state is through use of the NCIC. But where individual non-resident defendants "[have] taken deliberate action[s] within the forum state," a court should hold that they "purposefully availed" themselves of the privilege of doing business with that state. Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995).
 
 
 89
 Here, the record shows that at least two NYSDCS employees, Senior Warrant and Extradition Officer Joseph Badstein and NYSDCS Corrections Officer Augustus Kirkley, and possibly others, took the "deliberate actions" of requesting that the LAPD arrange the extradition of a purported fugitive, using the California criminal justice system to accomplish the extradition, sending the LAPD an identification packet to facilitate the extradition, regularly communicating with the LAPD during the extradition process, and traveling to Los Angeles to escort the purported fugitive back to New York. Cf. Maney v. Ratcliff, 399 F. Supp. 760, 768 (E.D. Wis. 1975) (finding that the arresting state had personal jurisdiction over the extraditing state authorities because the latter participated in a series of telephone calls and other contacts with authorities in the arresting state, even though the extradition of the fugitive was never completed).
 
 
 90
 Indeed, the facts in this case are distinguishable from the facts in both Cook and McLeod. In Cook, the plaintiff was arrested in Michigan on an Ohio fugitive warrant, about which the Michigan authorities learned through the NCIC. Cook, 788 F. Supp. at 348. The plaintiff was incarcerated in Michigan pending his extradition to Ohio. Id. Ultimately, the charges were dismissed, and the plaintiff brought an action against the Michigan authorities in the United States District Court for the Southern District of Ohio for, inter alia, violating his civil rights under § 1983. Id. The district court held that it lacked personal jurisdiction over the authorities in Michigan, the arresting state, because the only contact they had with Ohio, the extraditing state, was through the NCIC system; no Michigan official ever traveled to Ohio. Id. at 351.
 
 
 91
 Here, plaintiffs assert that California, as the arresting state, has personal jurisdiction over individual correctional officers from New York, the extraditing state. Plaintiffs further assert that individual NYSDCS defendants were in regular and direct communications with the LAPDduring the extradition of Kerry Sanders. Ultimately, Senior Warrant and Extradition Officer Badstein and Officer Kirkley traveled to California, took custody of Kerry Sanders in Los Angeles, and escorted him back to New York State. Their interaction with California's criminal justice system was thus far more than a mere impersonal and nonspecific connection made through the NCIC as was the case in Cook. Indeed, NYSDCS defendants could not have taken Kerry Sanders back to New York without actively seeking and receiving the aid and cooperation of California officials and making use of California's administrative and judicial extradition procedures as outlined in California Penal Code §§ 1547-1558.
 
 
 92
 In McLeod, the plaintiff, an Illinois sheriff's deputy, was assaulted in Illinois by two escaped Oklahoma prison inmates. 500 N.E.2d. at 725. The sheriff's deputy brought an action in Illinois state court against an Oklahoma prison warden, an Oklahoma prison, the Oklahoma Department of Corrections, and the State of Oklahoma claiming negligence in the control and supervision of the two Oklahoma inmates who escaped and assaulted him. Id. The defendants moved to dismiss the action for lack of personal jurisdiction. Id. Deputy McLeod contended that the Oklahoma defendants had purposefully availed themselves of the privileges and benefits of Illinois law by virtue of enacting the Uniform Extradition Act and using the NCIC system, even though none of the defendants had had any direct interaction with anyone in Illinois. Id. But the Illinois court granted defendants' motion, stating: "We find it an untenable conclusion that the Oklahoma legislature's action of adopting the Uniform Extradition Act or the use of the NCIC system could be construed as acts by which Oklahoma purposefully availed itself of the privileges and benefits of Illinois law." Id. at 726.
 
 
 93
 In this case, certain of the NYSDCS defendants were not mere passive participants in the extradition process as were the defendants in McLeod. Instead, they extensively interacted with officials in California. They communicated with and relied upon California law enforcement officers to detain and identify Kerry Sanders as the fugitive Robert Sanders; sent an information package about Robert Sanders to California specifically to aid in identifying him; requested that California authorities extradite Kerry Sanders; and deliberately traveled to California where they took custody of Kerry Sanders before transporting him back to New York State.
 
 
 94
 "The purposeful availment requirement ensures that defendants will not be `haled into a jurisdiction through random, fortuitous or attenuated contacts.' " Ziegler, 64 F.3d at 473 (citations omitted). The contacts that these individual NYSDCS defendants had with the LAPD were deliberate, extensive, "aimed at, and [had] an effect in" California. Id.
 
 
 95
 Accordingly, we hold that those NYSDCS defendants who traveled to Los Angeles to retrieve Kerry Sanders, or were otherwise directly and significantly involved in Kerry Sanders's extradition, purposefully availed themselves of the privilege of conducting activities in California.
 
 2. California-Related Activities
 
 96
 To establish personal jurisdiction over NYSDCS defendants, plaintiffs must also show that their claims arise out of California-related activities. Ziegler , 64 F.3d at 473. Here, the district court correctly ruled that plaintiffs satisfied this requirement for personal jurisdiction over the NYSDCS defendants. The court found, and we agree, that" `but for' the alleged contacts between the defendants and California, [Kerry Sanders's] claims would not have arisen." District Court Order 13 (citing Terracom v. Valley Nat'l Bank, 49 F.3d 555, 561 (9th Cir. 1995)).
 
 3. Reasonableness
 
 97
 Having concluded that at least two NYSDCS defendants personally availed themselves of the privilege of doing business in California, California's "exercise of jurisdiction is presumptively reasonable. To rebut that presumption,[the] defendant[s] must present a compelling case that the exercise of jurisdiction would, in fact, be unreasonable. " Ziegler, 64 F.3d at 476 (quoting Roth v. Garcia Marquez, 942 F.2d 617, 625 (9th Cir. 1991).
 
 
 98
 NYSDCS defendants have made no showing to rebut the presumption of reasonableness in this case with respect to the two NYSDCS officials who actually traveled to California and transported Kerry Sanders back to New York. Accordingly, we hold that, as to these two NYSDCS officials, it is reasonable for the district court to exercise jurisdiction over them. We remand for the court to determine, consistent with this opinion, whether it is reasonable to exercise jurisdiction over any other NYSDCS officials who were directly and significantly involved in Kerry Sanders's extradition.
 
 IV. CONCLUSION
 
 99
 In sum, we reverse in part the district court's Rule 12(b)(6) dismissal of plaintiffs' § 1983 claims against the City and the four individual LAPD officers. Plaintiffs state valid § 1983 claims that allege violations of the First and Fourth Amendments, as well as violations of plaintiffs' rights to due process and familial association under the Fourteenth Amendment. Plaintiffs, however, do not state valid § 1983 claims that allege violations of the Fifth and Eighth Amendments, as well as the Equal Protection Clause of the Fourteenth Amendment. We therefore affirm the district court's decision dismissing these claims. Nonetheless, because it is not clear that plaintiffs' Equal Protection claim cannot be saved by amendment, we remand this matter to the district court so that plaintiffs may have the opportunity to amend their First Amended Complaint with respect to that claim.
 
 
 100
 With respect to plaintiffs' ADA claim, we reverse the district court's decision dismissing the ADA claim with prejudice, and remand this matter to the district court so that plaintiffs may have the opportunity to amend their ADA claim. The district court's order denying plaintiffs' motion for leave to amend their First Amended Complaint is also reversed.
 
 
 101
 In addition, we affirm the district court's decision to dismiss the NYSDCS defendants for lack of personal jurisdiction with respect to those individual NYSDCS defendants whose sole interaction with Kerry Sanders occurred in New York State and who were not directly and significantly involved in Kerry Sanders's extradition from California. But we reverse the district court's dismissal of the action for lack of personal jurisdiction over the two NYSDCS defendants who actually traveled to California to retrieve Kerry Sanders, took him into custody, and escorted him back to New York State.
 
 
 102
 Finally, because the district court dismissed plaintiffs' state law claims for lack of supplemental jurisdiction following the dismissal of all federal claims, any state law claims alleged by plaintiffs in the First Amended Complaint against the City, the four individual LAPD officers, or the NYSDCS defendants are reinstated.
 
 
 103
 AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
 
 
 104
 Each side to bear their own costs of suit.
 
 
 
 Notes:
 
 
 [1]
 Plaintiffs' First Amended Complaint includes, inter alia, the following state law causes of action: (1) false arrest and imprisonment; (2) negligence, including negligent infliction of emotional distress; (3) intentional infliction of emotional distress; and (4) negligent hiring, training and retention of law enforcement officers.
 
 
 [2]
 The record indicates that when Kerry Sanders was first detained by the LAPD, its officers conducted a criminal records search of the National Crime Information Computer ("NCIC"). The NCIC search produced two warrants for an African-American male, born on June 25, 1966, with the surname Sanders: one for Kerry Sanders for failing to appear at a hearing in a Los Angeles court for a jaywalking violation that occurred in early 1993; the other for Robert Sanders, an escaped felon wanted for absconding from a work-release program at the Greenhaven Correctional Center in Stormville, New York on August 30, 1993. The fugitive warrant for Robert Sanders indicated that he had been imprisoned in New York for embezzlement beginning in 1990 until his escape in 1993. Thus, the two warrants facially revealed that Kerry Sanders and Roberts Sanders were two different people because they showed that Kerry Sanders committed a jaywalking violation in Los Angeles at the same time that Robert Sanders was incarcerated in New York State. In addition, according to LAPD records, in April 1992, Kerry Sanders was arrested in California for possession of a controlled substance at the same time that Robert Sanders was incarcerated in a New York State prison.
 
 
 [3]
 The record reveals that Kerry Sanders's extradition hearing was conducted simultaneously with that of several other individuals. During the hearing, Kerry Sanders never referred to himself as Robert Sanders. Initially, the court would not accept Kerry Sanders's waiver of his right to challenge the extradition. In response to the court's questions, Kerry Sanders stated that although he had signed a Waiver of Extradition form, he had not read it, it was not read to him, and he signed it "because they told me to sign it." After a brief recess, the court accepted the waiver. The waiver form identified him as Robert Sanders and waived Robert Sanders's right to challenge the extradition, but the waiver was signed "Kerry Sanders."
 
 
 [4]
 The First Amended Complaint added defendants as well as an ADA claim.
 
 
 [5]
 The district court dismissed sua sponte the claims of LAPD officers Holmstorm, McCallester, and Haddock despite the fact that these three defendants answered the First Amended Complaint and did not join in any of the motions to dismiss.
 
 
 [6]
 A heightened pleading standard, however, does apply in this circuit in "§ 1983 cases where the defendant is entitled to assert the qualified immunity defense and where her or his knowledge or intent is an element of the plaintiff's constitutional tort." Branch , 14 F.3d at 452. The distinction between pleading standards for municipalities and public officials in their individual capacities for constitutional torts springs from the fact "that municipalities -- unlike individuals sued under§ 1983 -- do not have immunity (either absolute or qualified) from suit. " Id. at 456 (citing Leatherman, 507 U.S. at 113). Thus, when plaintiffs sue public officials in their individual capacity under § 1983,
 to survive a [Rule 12(b)(6)] motion to dismiss, plaintiffs must state in their complaint nonconclusory allegations setting forth evidence of unlawful intent. The allegations of facts must be specific and concrete enough to enable the defendants to prepare a response, and where appropriate, a motion for summary judgment based on qualified immunity.
 Id. at 452.
 The Rule 12(b)(6) motion to dismiss at issue in this appeal was brought by the City. Therefore, the modest requirements of notice pleading under Leatherman govern our review of the legal sufficiency of plaintiffs' § 1983 claims in this case.
 
 
 [7]
 Moreover, the district court erred in effectively dismissing sua sponte plaintiffs' claims against the individual LAPD defendants Holmstrom, Haddock, McCallester, and Berumel with prejudice. These individual defendants never filed motions to dismiss. To the contrary, all except Berumel filed answers to the First Amended Complaint.
 Although "[a] trial court may dismiss a claim sua sponte under Fed. R. Civ. P. 12(b)(6)," Omar v. Sea-Land Serv., Inc., 813 F.2d 986, 991 (9th Cir. 1987), the court must give notice of its intention to dismiss and "afford plaintiffs `an opportunity to at least submit a written memorandum in opposition to such motion.' " Wong v. Bell , 642 F.2d 359, 362 (9th Cir. 1981). Here, the district court gave plaintiffs no notice of its intention to dismiss the § 1983 claims against defendants Holmstrom, Haddock, Berumel, and McCallester, let alone an opportunity to be heard on the matter before doing so. Even if we assume adequate notice, we will uphold a sua sponte dismissal without leave to amend only where the plaintiff "cannot possibly win relief." Id. As discussed infra, that is not the case here.
 Finally, the district court dismissed plaintiffs'§ 1983 claims with prejudice against these individual defendants without setting forth "written findings" in support of its decision. "[W]here the record does not clearly indicate the district court's denial [of leave to amend], we have been unwilling to affirm absent written findings." Mayes v. Leipziger, 729 F.2d 605, 608 (9th Cir. 1984). Indeed, absent such findings, we must reverse. See id.
 
 
 [8]
 See also Williams v. County of Sullivan, 157 F.R.D. 6, 8-9 (S.D.N.Y. 1994); Buenrostro v. Collazo, 777 F. Supp. 128, 136 (D.P.R. 1991), aff'd 971 F.2d 39 (1st Cir. 1992); Johnson v. City of Chicago, 711 F. Supp. 1465, 1470 (N.D. Ill. 1989).
 
 
 [9]
 Kerry Sanders actually signed the waiver form as "Kerry Sanders" and not as "Robert Sanders." The other handwritten portions of the waiver appear to be have been written by someone else.
 
 
 [10]
 These allegations were included in both the Original Complaint and in the First Amended Complaint.
 
 
 [11]
 The ADA defines a "qualified individual with a disability" to include anyone with a disability:
 who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
 42 U.S.C. § 12131(2).
 
 
 [12]
 Plaintiffs point out on appeal that the district court should not have dismissed the ADA claim against the City because the City never moved to dismiss this claim.